**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VVONAKA RICHARDSON, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No. 22-cv-5495 |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., STATE FARM LIFE INSURANCE CO., STATE FARM FIRE AND CASUALTY CO., STATE FARM GENERAL INSURANCE CO., and STATE FARM BANK, F.S.B., | **Jury Trial Demanded** |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Vvonaka Richardson ("Richardson"), through her counsel Stowell & Friedman, Ltd., Ben Crump Law, PLLC, and Leinenweber Baroni & Daffada, LLC, on behalf of herself and all others similarly situated, files this Complaint of race and discrimination and retaliation against Defendants State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Co., State Farm General Insurance Co., and State Farm Bank, F.S.B., and in support states as follows:

**JURISDICTION AND VENUE**

1. Plaintiff's claims arise under 42 U.S.C. § 2000e *et seq.*, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3). State Farm is headquartered in this state, the discriminatory policies and practices emanated from this state, and the employment records relevant to such practice are maintained and administered in this

1

state. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

## PARTIES

3.      State Farm Mutual Automobile Insurance Company is the parent company of State Farm Life Insurance Company, State Farm Fire and Casualty Company, State Farm General Insurance Company, and State Farm Bank, F.S.B., (collectively "State Farm," "the Firm," or "Defendants"). All of these entities are Illinois corporations with their principal place of business in Bloomington, Illinois.

4.      Plaintiff Vvonaka Richardson is African American and worked for State Farm as a Term Independent Contractor Agent from June 2019 until she was unlawfully terminated in approximately July 2020. Throughout her employment, Richardson competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her devotion to her job.  Pursuant to its discriminatory policies and practices, however, State Farm subjected Richardson to race and sex discrimination and retaliation for challenging the Firm's discriminatory practices. Plaintiff is a named plaintiff and class member in the putative nationwide class action, *Williams v. State Farm*, No. 20-cv-1121, pending in the Northern District of Illinois. The race discrimination suffered by Plaintiff is consistent with and part of the nationwide, systemic discrimination against African Americans alleged in *Williams v. State Farm*.

## OVERVIEW

5.      State Farm is "the leading auto and home insurer in the United States" and is currently ranked number 36 on the Fortune 500 list of largest companies in the United States.

According to its Annual Report, in 2018, State Farm generated premium revenue of over $43.4 billion and net income of approximately $6.4 billion.

6.      State Farm offers insurance and financial products to customers through its workforce of over 19,000 Agents across the United States.  State Farm provides widely divergent compensation and opportunities to the Agents who service its customers, depending on their race. African Americans are underrepresented as State Farm Agents and paid substantially less than their counterparts who are not African American.  These racial disparities result from State Farm's systemic, intentional race discrimination and company-wide discriminatory policies and practice, which have a disparate impact on African Americans.

7.      State Farm maintains a racially biased corporate culture replete with harmful stereotypes regarding its African American employees and customers that infects its policies and decision-making, including its racial steering and race-matching of Agents, territories, and clients.  Plaintiffs, and the class they seek to represent in this lawsuit, challenge State Farm's company-wide policies and practices that result in higher rates of discipline and lower pay for African Americans.

8.      Plaintiffs file this lawsuit to hold State Farm accountable for its unlawful treatment of African American Agents and to achieve meaningful reform.  This lawsuit is brought by Plaintiffs on behalf of themselves and other African American State Farm Agents subjected to and harmed by the Firm's company-wide pattern or practice of race discrimination and discriminatory policies and practices.  This action seeks class-wide injunctive relief to end State Farm's entrenched race discrimination and make-whole relief for class members.

## FACTUAL ALLEGATIONS

9.     State Farm maintains a corporate culture replete with harmful racial stereotypes and biased views about the skills, abilities, and potential of African American employees, including Agents, and customers.  The Firm's racial bias is exemplified by its racial steering, racial redlining and other discriminatory practices against employees and customers of color, as illustrated in a number of recent lawsuits.

10.     State Farm has faced at least two class actions brought by employees challenging the Firm's entrenched discrimination,[1] and at least two other African American Agents are currently suing State Farm and make similar allegations of race discrimination as those raised in this Complaint, including that State Farm subjects African American Agents to heightened scrutiny and differential discipline. *See Florvius v. State Farm*, No. 12-cv-2912 (N.D. Ga. July 28, 2020), ECF No. 8 (alleging State Farm subjected her to increased scrutiny and termination for purported infractions while failing to audit or punish white Agents for similar or more egregious violations of State Farm policies); *Bazil v. State Farm*, No. 20-cv-2914 (N.D. Ga. July 26, 2020), ECF No. 9 (same).

11.     State Farm's long history of racial discrimination also extends to its customers of color, as illustrated by a pending class action charging discrimination against African American policy holders. *See Connectors Realty Group Corp. v. State Farm*, No. 19-cv-0743 (N.D. Ill. Feb. 5, 2019), ECF No. 24, 38 (denying motion to dismiss class claim of discrimination brought by African American policy holders, and including allegation that State Farm refused to process

---

[1] *State Farm Settles Discrimination Lawsuit*, AP (Nov. 21, 1990), https://apnews.com/1660be099229e8bcd1d5bf6897f1f38d; Philip Hager, *State Farm to Pay Women $157 Million for Job Bias : Total Damages Against Insurance Firm May Exceed $200 Million. Award Is Record for Civil Rights Case*, L.A. TIMES (Apr. 29, 1992), https://www.latimes.com/archives/la-xpm-1992-04-29-mn-886-story.html.

insurance claim for African American customer because "we have a lot of fraud in your area," referring to the "South Side of Chicago and you all's neighborhoods").

12.     State Farm maintains a racially hostile culture and environment in which there is no accountability for racist conduct and statements. For example, a prominent white Agent in the midwest engaged in a racist rant on a public social media platform, claiming an African American man wanted "to rely on the government" and told him to "Go get another my[sic] babies mama" and "go back to Africa." Despite complaints, the agent remains at State Farm.

13.     State Farm lacks any meaningful avenue for African American Agents to complain or seek redress for disparities in opportunities and resources. State Farm is ineffective at resolving complaints of discrimination, which are typically ignored or result in the complaining employee being targeted for retaliation.  Most African Americans recognize the futility of lodging internal complaints of race discrimination. Those brave enough to come forward suffer retaliation.

14.     Following the killing of George Floyd and subsequent racial justice movement, State Farm, like other large corporations, issued a statement that "our society still suffers from far too many cases of distrust, hatred and racism." State Farm, however, has failed to address the claims of racism within its own ranks. Nevertheless, the widespread nature of racial discrimination at State Farm has been voiced by the State Farm workforce.  Agents and employees of color created a petition to State Farm describing past and present racial inequality and demanding racial equity in the State Farm workplace. The petition asked Black State Farm agents and employees to sign if they knew of State Farm personnel who had been let go unfairly, had to go scratch (agents forced to start without a book of business) or been given a smaller book of business, experienced or seen racism at work, received less resources, or were afraid to speak

up in fear of backlash, among other discriminatory practices. To date, nearly 1,600 State Farm

employees of color have signed the petition to demand change and racial equality at the Firm.[2]

**I.      State Farm Is Engaged In Firm-Wide Systemic Discrimination Against African American Agents**

15.     State Farm maintains strict, centralized control over its operations and Agents

from its company headquarters in Bloomington, Illinois, where an almost exclusively white team

of senior executives issues mandatory company policies and practices that apply to all Agents in

the State Farm workforce. State Farm requires each of its Agents to sign nearly identical Agent

Agreements that govern their employment relationship and dictate the conditions under which

the Agents operate and may offer State Farm's insurance and financial products to customers.

16.     State Farm is engaged in a firm-wide pattern and practice of discrimination

against African Americans and employs company-wide practices and policies that have a

disparate impact on African American Agents in their terms and conditions of employment.

State Farm issues, implements, and oversees uniform, company-wide policies and practices that

discriminate against African American Agents and advantage non-African American Agents at

the expense of African American Agents.  Because of the Firm's stereotypical views and

discriminatory employment practices, African Americans are under-represented among State

Farm Agents by statistically significant margins as compared to the national average.

17.     Among other things, State Farm maintains discriminatory training practices and

its discriminatory policies and practices provide African Americans less lucrative agencies and

territories; deny them valuable business opportunities (including Agent contracts) and resources;

---

[2] *State Farm: Employees & Agents of Color Demand Racial Equality & Equity in the Workplace*, MoveOn, https://sign.moveon.org/petitions/state-farm-employees-agents-of-color-demand-racial-equality-equity-in-the-workplace.

subject them to heightened scrutiny and differential discipline; and result in lower pay than Agents who are not African American.

**Term Independent Contract Agent ("TICA Agent")**

18.     State Farm employs discriminatory policies and practices in its TICA program, including its policies and practices regarding performance evaluation, training, and the assignment of policies, business opportunities, and other resources and support, as well as the awarding of full Agent contracts to Agents in training, or TICA Agents.

19.     State Farm recruits African Americans to join the Firm as Agents through its TICA program, often luring them away from stable and well-paying jobs, with the promise of lucrative business opportunities and careers. State Farm requires these TICA Agents to invest substantial sums of their own money in rent, offices, marketing, sales leads, and hiring a team. State Farm, however, denies African American TICA Agents the same business opportunities, support, training, and resources provided to non-African American TICA Agents, subjects African Americans to more stringent performance standards, and denies African American Agents permanent agency contracts on the basis of their race.

20.     TICA Agents must complete a 17-week State Farm training course before they open an agency and begin selling insurance, during which period State Farm considers them employees. State Farm provides largely sales training. Rather than train prospective Agents in how to successfully run an agency, State Farm selects who will succeed by assigning non-African American Agents lucrative locations to open their agency and assigns them established books of business and policies. African American TICA Agents are in turn steered to less lucrative agency locations and are not given books of business or given substantially smaller policies or books of business than their non-African American peers.

21.     At the conclusion of 13-months, State Farm decides whether to extend a full Agent contract to the TICA Agent or terminate the Agent.

22.     State Farm's TICA training program uses and applies criteria intentionally designed to discriminate against African Americans, both in the training program itself, and in the opportunities steered toward non-African American TICA Agents and ultimately, by who gets selected for full Agent contract.

23.     State Farm maintains extensive control over its TICA employees, including, for example:

- State Farm insists that TICAs exclusively represent State Farm and a TICA cannot sell insurance for any other insurance company;

- TICAs do not own their books of business, and State Farm retains the TICA's book of business and redistributes it among other Agents if a TICA is terminated;

- State Farm maintains discretion over where a TICA opens his or her agency and the appearance of the physical building, including signage and branding;

- State Farm claims the right to change TICA compensation without prior notice or consent;

- TICAs must use State Farm computers and programs to maintain client records, and State Farm monitors and reviews TICA Agents' records without consent;

- State Farm sets performance standards and monitors TICA's performance regularly; and

- State Farm controls and approves all TICA advertising and requires TICAs to pay for marketing through State Farm or its approved third-party vendors.

**Territory and Agency Assignment**

24.     State Farm employs company-wide policies and practices for assigning territories and agency locations that discriminate against African American Agents and TICA Agents. Pursuant to these policies and practices, State Farm assigns the most lucrative territories and agency locations to Agents who are not African American while assigning African American Agents less lucrative and more problematic agencies and territories on the basis of their race.

25.     State Farm disproportionately gives non-African American Agents a head start in their careers by allowing them to take over existing agencies with substantial books of business from Agents who have moved or who no longer work for the Firm. By contrast, State Farm generally requires African American Agents to start new agencies with substantially less lucrative books of business or from "scratch" and without existing insurance policies or financial products.

26.     In addition, State Farm disproportionately assigns non-African American Agents to territories and agency locations in areas with more affluent populations, while relegating African American Agents to areas with considerably less wealth. The Firm also engages in "race matching," by assigning African American Agents to areas with higher African American and minority populations.

27.     State Farm's policy and practice of disproportionately assigning non-African American Agents to territories and agency locations in more affluent areas affords them greater opportunities to generate income, in part, because wealthy customers have more need for and ability to purchase insurance and financial products than customers with lower incomes and less wealth. More affluent customers are also more likely to pay their bills on time, freeing the Agents who serve them from the need to hire employees and use resources to engage in

collection efforts for overdue premiums, and allowing the Agents to devote more resources to sales.

28.     State Farm also disproportionately authorizes non-African American Agents to expand their agencies to additional locations, while denying those income-generating opportunities to African American Agents, even very successful African American Agents.

**Insurance Policy and Financial Product Assignments**

29.     State Farm's company-wide policies and practices for assigning insurance policies and financial products give the most lucrative business opportunities to Agents and TICA Agents who are not African American, and assign African American Agents less lucrative business opportunities.

30.     When an Agent retires or leaves the Firm, State Farm reassigns the Agent's customers and existing insurance policies to other Agents. Agents who receive these assignments gain not only the value of these policies and any financial products the customers may have, but also ongoing commissions and the opportunity to grow the customers' accounts or to gain new customers through leads and referrals. Thus, the discriminatory distribution of policies has a substantial impact on the number, value, and quality of policies and accounts that Agents manage, and on their compensation. Pursuant to State Farm's discriminatory policies and practices, African Americans are largely excluded from being assigned lucrative insurance policies, even when they achieve high-performance distinctions.

31.     When State Farm does assign insurance policies to African American Agents, they are generally fewer in number, more problematic, and less lucrative than those that State Farm assigns to non-African American Agents.

32.     Moreover, because of State Farm's discriminatory policies and practices regarding assignment of territories and agency locations, it is more difficult for African American Agents to retain policy assignments they receive.

33.     Similarly, in addition to denying African American Agents business opportunities, State Farm provides Agents who are not African American with valuable resources and support, which are denied to African American Agents.

**Compensation and the Scorecard Bonus**

34.     State Farm employs intentionally discriminatory compensation policies, and compensation policies and practices that have a disparate impact on African Americans that provide widely divergent compensation to Agents depending on their race.

35.     Among other discriminatory compensation practices, State Farm provides substantial compensation to its Agents pursuant to a uniform, nationwide compensation policy and practice called the "Scorecard Bonus." State Farm intentionally selects and relies on factors that disadvantage African Americans to calculate eligibility for and the amount of the Scorecard Bonus paid to Agents.

36.     Because State Farm uses commission-based and cumulative-advantage systems to evaluate and compensate its Agents, a level playing field and fair distribution of resources and business opportunities are essential. However, State Farm's discriminatory policies and practices deny African American Agents opportunities, resources, and substantial compensation.

37.     For example, State Farm steers African American Agents toward less affluent territories and/or assigns them to territories in which the clientele match the Agents' race. African American Agents are therefore disadvantaged because many of the clients in their territories cannot afford to purchase financial service products and purchase fewer or less

11

expensive insurance products. Further, the Firm intentionally distributes more, and more lucrative, policies and financial products to non-African American Agents, and denies similarly situated African American Agents such distributions. Moreover, State Farm targets African American Agents for compliance issues, denying African American Agents the opportunity to offer financial products to their clients.

38.     Because of these and other company-wide policies and practices, African American Agents are substantially less likely than non-African American Agents to meet the requirements of the Score Card Bonus policy. State Farm employs these and other policies and practices to discriminate against African American Agents and to deny compensation to African American Agents, and which otherwise have an unlawful disparate impact on African Americans.

**Compliance Auditing, Discipline, and the Termination Review Plan**

39.     State Farm's company-wide policies and practices regarding performance, compliance, discipline, and termination discriminate against African American Agents. These discriminatory policies and practices are designed to target African American Agents and force them to either resign or be terminated.

40.     Pursuant to its discriminatory policies and practices, State Farm subjects African American Agents to heightened scrutiny, holds them to higher compliance standards, and imposes greater discipline, including termination, on African American Agents for alleged violations of Firm policies than it does on similarly situated non-African American Agents. Through Firm-wide practices, including review and approval by a corporate review committee, State Farm disproportionately audits and disciplines African American Agents.

41.     Among other discriminatory practices, State Farm disproportionately denies or rescinds the right of African American Agents to offer financial products. The inability to offer financial products limits an Agent's compensation and ability to attract and maintain customers and makes an Agent ineligible to open a second agency location or receive policy assignments. Non-African American Agents' policy violations are routinely ignored or result in lesser discipline, and they are routinely assigned lucrative policy assignments and eligible to offer financial products, compounding their success and the racial disparity in earnings.

42.     State Farm employs a centralized practice called the "Termination Review Plan." Agents who have been informed that the Firm intends to terminate their Agent Agreement may request a termination review from State Farm's Chief Executive Officer ("CEO") pursuant to policies and practices approved by State Farm's Board of Directors.

43.     A State Farm review team makes findings and/or recommendation for the CEO who makes the final decision of whether to terminate the Agent.

44.     State Farm's centralized system for terminating Agents is poisoned by racial bias and intentional discrimination, and results in significant racial disparities between Agents who State Farm elects to terminate and those it decides to continue to employ.

45.     Moreover, when State Farm terminates African American Agents, their policies are disproportionately divided among non-African American Agents, further compounding the racial inequities within the Firm.

## II.     Plaintiff Was Subjected to and Injured By State Farm's Unlawful Conduct

46.     Consistent with State Farm's systemic discrimination against African Americans, Plaintiff has been subjected to race discrimination throughout her career, in addition to being subjected to sex discrimination and harassment and retaliation.

47.     Plaintiff Vvonaka Richardson became a State Farm TICA Agent in June 2019, after she worked for several years as a licensed sales representative for another State Farm Agent in Tuscaloosa, Alabama.

48.     Despite Richardson's significant experience with State Farm and in the sale of insurance products, State Farm denied Richardson business opportunities, support, and resources regularly provided to non-African American Agents, and denied her a full Agent contract.

49.     Richardson was assigned to open her agency in Mobile, Alabama. At that time, two senior State Farm Agents had recently died, and State Farm needed to find new Agents to take over their considerable books of business. State Farm promised Richardson a substantial portion of the two books of business. Consistent with its discriminatory policy assignment practices, however, State Farm instead denied Richardson the amount of policies it promised and instead assigned the majority of the policies and books of business to a white TICA Agent.

50.     At State Farm's direction, Richardson made her business plan (and expense budget) based on the value of the promised policies. Despite denying her the amount of policies it promised, State Farm refused to allow her to adjust these production goals and instead evaluated her performance based on these inflated numbers.

51.     Despite being assigned significantly less in assets than State Farm promised, Richardson worked hard to achieve success at State Farm. Indeed, two senior African American Agents assured Richardson that she was performing well as a TICA Agent.

52.     Throughout her tenure, Richardson's direct manager subjected her to a hostile work environment. In addition to denying Richardson opportunities and resources as described above, her manager discussed sex in front of her and attempted to solicit a sexual relationship in

exchange for promising benefits, including her permanent Agent contract. Richardson repeatedly rejected her manager's advances and was subjected to threats and retaliation as a result.

53.     Like many State Farm Agents, Richardson lost several team members as a result of the Covid-19 pandemic. In or around April 2020, State Farm told Richardson that she had 60 days to get a new team in place or she would not be given a full Agent contract. Richardson hired and trained a new team, at great expense to herself, and in the middle of a pandemic, and submitted a new action plan to State Farm. However, State Farm refused to alter her production requirements or support her in any way despite the economic turmoil and uncertainty during Covid. Consistent with the Firm's discriminatory practices, Richardson understands that State Farm provided support and granted exceptions during the pandemic to TICA Agents who were not African American, including by extending their TICA contracts.

54.     Richardson asked State Farm management and its CEO for an extension of her TICA contract in light of the pandemic. State Farm denied her request and denied her a full Agent contract in the summer of 2020. Richardson understands that State Farm gave white TICA Agents who did not meet production goals extensions and full Agent contracts. Indeed, a majority of the TICA Agents denied contracts in Richardson's TICA class were African American, despite being a substantial minority in the class.

55.     Richardson complained of race discrimination and disparate treatment to State Farm management, including CEO Michael Tipsord and the newly appointed Chief Diversity Officer Victor Terry, to no avail. Richardson did not even receive a response to her serious allegations of race discrimination. Like other African Americans who dared to complain, State Farm retaliated against Richardson, including by refusing to assist her efforts to build a successful agency at State Farm and refusing to extend her a full Agent contract.

15

56.     As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Richardson has suffered substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

## CLASS ALLEGATIONS

57.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who work or worked for State Farm as Agents and Term Independent Contractor Agents. The proposed class meets all requirements for class certification under Federal Rule of Civil Procedure 23.

58.     The class of African American employees and former employees is so numerous and geographically disbursed that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1).

59.     There are numerous questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. FED. R. CIV. P. 23(a)(2).

60.     The claims alleged by Plaintiff are typical of the claims of the class members. FED. R. CIV. P. 23(a)(3).

61.     Plaintiff will fairly and adequately represent and protect the interests of the class, and she has retained competent and experienced counsel to represent the class. FED. R. CIV. P. 23(a)(4).

62.     The proposed class meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3).

63.     The issues of determining liability and equitable and injunctive relief, among other issues, are appropriate for certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

64.     Plaintiff Richardson, on behalf of herself and those similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

65.     Plaintiff Richardson filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), which placed Defendants on notice of the representative allegations contained in this Complaint.  Plaintiff Richardson has exhausted her administrative remedies and received a Notice of Right to Sue from the EEOC and timely filed her individual and class Title VII claims.[3]

66.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

---

[3] The parties entered into a tolling agreement to toll the time for Plaintiff Richardson file her Title VII claims.

67. By its conduct as alleged herein, Defendants unlawfully discriminated against Richardson and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

68. Plaintiff Richardson and all those similarly situated were subjected to and harmed by State Farm's systemic and individual discrimination.

69. On behalf of herself and the class she seeks to represent, Plaintiff Richardson requests the relief set forth below.

## COUNT II

### SEX DISCRIMINATION AND HARASSMENT IN VIOLATION OF 42 U.S.C. § 2000e *et seq.*

70. Plaintiff Richardson realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

71. Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of sex.

72. By its conduct as alleged herein, Defendants unlawfully discriminated against Richardson based on her sex in violation of Title VII.

73. Plaintiff Richardson was harmed by Defendant's conduct.

74. On behalf of herself, Plaintiff Richardson requests the relief set forth below.

## COUNT III

## RETALIATION IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

75.     Plaintiff Richardson realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

76.     Plaintiff Richardson engaged in protected activity by complaining of her unlawful treatment.

77.     Plaintiff Richardson suffered retaliation and harm because of her protected activity, in violation of Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in favor of her and the class she seeks to represent and against Defendants as follows:

a.   Certify this case as a class action;

b.   Designate Plaintiff as Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c.   Declare the State Farm acts, conduct, policies and practices alleged herein are unlawful and violate 42 U.S.C. § 2000e *et seq.*

d.   Declare that State Farm engages in a pattern and practice of racial discrimination against African Americans and employs policies and practices that have an unlawful disparate impact on African Americans;

e.   Order that State Farm stop discriminating and retaliating against African Americans;

f.   Order Plaintiff and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make them whole;

g.   Award Plaintiff and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of State Farm's unlawful conduct;

h.   Award Plaintiff and all other all others similarly situated compensatory and punitive damages;

i.   Award Plaintiff and all others similarly situated prejudgment interest and attorneys' fees, costs, and disbursements, as provided by law;

j.   Award Plaintiff and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate them;

k.   Declare that State Farm's actions and conduct constitute unlawful sex discrimination and retaliation as to Plaintiff Richardson, individually, pursuant to 42 U.S.C. § 2000e *et seq.*; and

l.   Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided for by Rule 38 of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiff and those similarly situated,

 */s/ Suzanne E. Bish*

Linda D. Friedman
Suzanne E. Bish
George S. Robot
Mark S. Current
STOWELL & FRIEDMAN, LTD
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com
Sbish@sfltd.com
Grobot@sfltd.com
Mcurrent@sfltd.com

Justin L. Leinenweber
LEINENWEBER BARONI & DAFFADA, LLC
120 N. LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 380-6635
justin@ilesq.com

Benjamin L. Crump (pro hac vice)
BEN CRUMP LAW, PLLC

122 S. Calhoun St.
Tallahassee, FL 32301
(800) 713-1222
court@bencrump.com

Nabeha Shaer (pro hac vice)
BEN CRUMP LAW, PLLC
633 Pennsylvania Ave NW, Fl. 2
Washington, DC 20004
(800) 958-1444
nabeha@bencrump.com